## SANGER v. McDONALD.

### Opinion delivered April 22, 1907.

TRIAL—IMPROPER ARGUMENT—COMMENT ON FAILURE OF ATTORNEY TO TES-
TIFY.—It was prejudicial error to permit the attorney of the con-
testants of a will to allude in his argument to the fact that the
attorney of the contestees, who wrote the will and was present when
it was signed, did not testify, and to comment on this omission as
a circumstance to be considered as against the contestees, if it does
not appear that such attorney knew any facts which could not be
proved by other witnesses.

Appeal from Howard Circuit Court; *James S. Steel,* Judge;
reversed.

#### STATEMENT BY THE COURT.

Will Sanger, Laura Sanger, Blanche Withrow, Libbie
Sanger and George Sanger were proponents of the will of Mrs.
Mary J. Johnson.

Mollie E. McDonald and Lula Wolff contested the will.
They alleged that the testatrix died seized of a large estate of
real estate and personal property situated in Arkansas and Texas,
and of the value of $41,000. That the paper purporting to be
the last will of the testatrix does not provide for the children of
the deceased, according to the natural love and inclination of a
mother, and without any just cause shown or known purports
to give all her personal property and all but a very small portion
of her real estate to the proponents, except Geo. Sanger, leaving
Geo. Sanger and contestants unprovided for. Among other al-
legations are these: "That said paper is not the will of Mary J.
Johnson, deceased, but was procured by Will Sanger through
fraud practiced upon Mollie E. McDonald and Lula Wolff.
That the will, if subscribed by the testatrix, was procured by
fraud and undue influence exercised over her before and at the
time the same was subscribed, and that said influence was used
for the sole purpose of the beneficiaries under said last will
and testament, as shown therein, and against the interest of the
other heirs at law of the said decedent, the contestants herein."

The probate court admitted the will to probate, and con-
testants appealed. In the circuit court the cause was submitted
to the jury upon the issue as to whether or not the paper admitted

to probate by the judgment of the probate court was the will of Mary J. Johnson.

Appellee contended that it was not her will because of fraud upon and undue influence over her by her son, Will Sanger, by which she was induced to execute the purported will.

Mrs. Mary J. Johnson at the time of her death owned property which may be listed, and conservatively valued, under the evidence, as follows:

The 1-5 interest in Stiffit corner, Little Rock, $6,000.00
Less mortgage...................... 2,250.00

|  |  |
|---|---|
|  | $3,750.00 |
| Six (6) lots in block 281, Little Rock............. | $4,800.00 |
| Centennial lots, Little Rock...................... | 2,000.00 |
| Texas lands..................................... | 3,000.00 |
| Nashville homestead............................. | 1,500.00 |
| Faulkner County 80 acres........................ | 350.00 |
| Personalty .:................................... | 1,000.00 |
| Total................................ | $16,000.00 |

There were some other tracts in Pulaski County besides the lots above mentioned, but the number of acres was not ascertained from the proof.

The proponents and contestants were children of Mrs. Johnson. The will propounded gave to contestants, each, a lot and a half (75 feet) in block 281 in the city of Little Rock. Each tract given contestants was worth about $1,200. She gave her son, Geo. Sanger, $10. But he is not contesting. She gave her three then single daughters the home place in Nashville, valued at $1,500, and devised the residue of her estate, real and personal, to these three daughters and her son, Will.

The circumstances of the execution of the alleged will, which we will hereafter call the will, are substantially as follows: Mrs. Johnson was afflicted with cancer, and was on her deathbed. She lived in Nashville, Arkansas. Her son Will and three unmarried daughters were living with her. Will had lived with his mother practically all his life till her death. For fifteen years he had assisted her, to some extent, in looking after her property. The contestants were married, and lived away from their mother's home. They had been sent for, and were at her home when the will was executed. According to their testimony, they did not

know that the will was to be executed until their brother called them into the room, apart from the room where their mother was, and said to them: "As mother is growing weaker, I thought best to make her will, and as everything she has, even to the home place, is heavily incumbered, I thought best to give you a thousand dollars a piece." Mrs. McDonald protested, and said she would go in and tell her mamma what her brother was trying to do; whereupon Will said: "No, before I would have you go in and approach mamma on the subject, I would take a razor and cut my right arm off." Mrs, McDonald asked her brother if their mother still owned the lots in Little Rock, and he then said: "Yes, that is the only property mother has that is not heavily incumbered." Mrs. McDonald said: "Instead of giving me a thousand dollars, give a hundred feet off of block 281 in Little Rock." Will replied that before he could do this he would have to go and consult Dr. Corn, the attending physician. Will then "took his leave," and came back into the room and said: "I have just had a conversation with Dr. Corn, and he advises me not to give more than seventy-five feet, as this is valuable property." Contestants then say that Will made a memorandum on some paper, and Mr. Rodgers, an attorney was sent for. When Mr. Rodgers came, Will handed him the data he had prepared, and from this Mr. Rodgers wrote the will. Mrs. McDonald, who was present when the will was signed, said: "Mother was lying down in bed when the will was executed. Willie handed her her glasses, and she read two or three lines, and got so weak she could not speak, and she handed it back to Mr. Rodgers, who finished reading it. Mother did not sign any other paper that day. I heard the will read when it was executed. Mother did not ask me whether I was satisfied with the will after it was read. She did not make any remark of any kind while the will was being executed. She handed the will for Mr. Rodgers to finish reading it, because she got so weak she could not read any more. I did not at the time make any objections to it."

The contestants testified that their mother had promised them some time before that they should have their share of the estate. They thought, on account of the representations made by their brother as to the incumbrances on the estate, that they

were getting their share. Their brother represented that the 75 feet given them in the will was more than their share. These lots were worth about $1,200 each.

Will Sanger gave the following testimony concerning the preparation and execution of the will: "I was at home the day mother's will was executed. I had a conversation with mother that morning before the will was prepared, in reference to the execution of the will. Mother requested me to go see Mrs. McDonald and Mrs. Wolff, and ascertain what part of the property they expected. She told me that she had told Dr. Corn to bring Mr. Rodgers down, that she was going to make her will, that she wasn't going to put it off any longer; and requested me to go and ask Mollie and Lula what they expected. I went out and told them that mamma was going to make her will; that she had sent Dr. Corn to bring Mr. Rodgers down, and she wanted to know what part of the property they were expecting."

Witness then goes into detail as to the conversation that took place between himself and his sisters, the contestants, in which he says that he fully explained to them the situation, giving them correct and accurate information concerning the various tracts of land owned by his mother, and the value thereof, and the incumbrances thereon. He contradicts positively and sharply the testimony of his sisters, and according to his testimony said that his sister, Mrs. McDonald, said that she would be satisfied with a lot and a half off of block 281 in Little Rock, and that his sister, Mrs, Wolff, did not want anything, but that he insisted that she have something. His testimony then continues as follows:

"I then went and told mother that they wanted a lot and a half off of block 281, and that they would be satisfied with this, and she said she would give it to them. I went and told them that mamma had agreed to give them a lot and a half each, and that they could choose between themselves which they would respectively have. They drew straws for the choice, and it fell to Lula. At Lula's request, I selected the east lot and a half for her. I then went and told mamma the result. She said she wanted the girls at home to have the home place, and I put down the home place for Laura, Libbie and Blanche. She told me to put down ten dollars for George, my brother. She then said to divide

the balance of the property equally between Laura, Libbie, Blanche and myself, and I did so. When Mr. Rodgers came down, I gave him the memorandum I had thus written at her request. The will disposes of the property in accordance with this memorandum."

The witness further testified as follows: "I prepared the data for the will under mother's instructions. She did not write any of it down. I wrote it down in her presence. I gave this data to Mr. Rodgers when he came. He came that morning in company with Dr. Corn. My recollection is, Mr. Rodgers did not see mother until after he prepared the will. I suppose he was something like twenty minutes in preparing it. As soon as it was prepared, I went into mother's room. The will was drawn from the data which I furnished Mr. Rodgers. The reason I didn't take my sister into the room to talk with mother about the disposition of the property is, she did not request me to do so. I did not request them to go in there. They were not in the room where the data were prepared."

Dr. Corn testified in part as follows: "I knew the testatrix in her lifetime; attended her in her last illness, and was present when her will was executed. I went to see her that morning shortly after breakfast. She told me on this occasion that she wanted to make her will, and that she tried to get her son Will to bring Mr. Rodgers down and attend to it, but that he always put her off, thinking it might worry her. She asked if I would get Mr. Rodgers and bring him down with me to write the will. In response to this request, I went to Mr. Rodgers's office and got him. I brought him down some time before noon. He and I witnessed the will. I think every member of the family that was here was present at the execution of the will. I don't think they all went into the room together. Think she had some of them called. When Mr. Rodgers came in with the will, she called for her glasses, and they set her up in bed. She looked at the will and started to read it, and remarked to Mr. Rodgers that he could read his own handwriting better than she, and asked him to read it. He read it, and asked if that was her will and testament, and she said it was. She had each of the children called in, and the will was read to them, and she asked them if they were satisfied, and they answered that they were. Mrs. Wolff and

Mrs. McDonald both said they were satisfied. One said, 'Perfectly satisfied;' the other, 'More than satisfied.'"

The will was prepared in the southwest room. Mrs. Johnson was in the northwest room.

One other witness, Mrs. Smith, was present when the will was executed; also other of the proponents. But none of these give any testimony as to what was done or said by Mr. Rodgers different from that set forth.

There was a verdict and judgment for appellees, contestees. This appeal follows.

*W. C. Rodgers, Ratcliffe & Fletcher, Feazel & Bishop* and *W. S. Eakin,* for appellant.

It was reversible error to permit the attorney for contestants in his closing argument to call attention to the fact that the attorney who drew the will had not testified, and to comment upon this fact as a circumstance to be considered against the proponents. It is not proper for an attorney to volunteer as a witness for his clients except where it is imperatively necessary to prevent a miscarriage of justice. 12 Tex. 180; 1 Sandf. (N. Y.) 607; 8 Pa. St. 520; 48 Ark. 106. And when appellants objected to this argument, the objection was overruled; hence it went to the jury with the force of an instruction from the court. 76 Ark. 430. Such assertions or appeals can serve no purpose except to mislead the jury and defeat the ends of the law in requiring them to confine their consideration to the evidence adduced and the law embodied in the instructions of the court. 61 Ark. 130; 63 Ark. 174; 65 Ark. 619; 70 Ark. 305; *id.* 179; 71 Ark. 415; 73 Ark. 148; 74 Ark. 210; 75 Ark. 577.

*Sain & Sain, W. S. McCain, H. L. Norwood* and *J. S. Lake,* for appellees.

It was not improper in this case to refer to the fact that the attorney who drew the will had not testified. He was a witness to the will. The question is not whether an attorney should become a witness, but whether a witness should become an attorney. This seems to be one of the cases in which it was neither illegitimate nor unprofessional for an attorney to testify.

WOOD, J., (after stating the facts.) There were thirty-six assignments of error in the motion for new trial. But the

majority of the court decline to consider any of these except the following:

"29. Error in permitting J. S. Lake in his closing argument to allude to the fact that Mr. Rodgers had not testified and to comment on this omission as a circumstance to be considered as against the contestees."

The record shows that, over the objection of the contestees, Mr. J. S. Lake, in his closing argument for the contestants, was permitted to allude to the fact that Mr. Rodgers had not testified, and to comment on this omission as a circumstance to be considered against the contestees. Exception to the court's ruling was saved.

We have set forth fully in the statement of facts the evidence bearing upon the execution of the purported will, and the circumstances connected therewith, so as to show the nature of the contentions that were being pressed by the parties, and the effect that the remarks of counsel might have in producing the result obtained. Whether or not there was sufficient evidence to support the verdict, we will not now determine, as the cause must be remanded for another trial. It suffices to say that there was an exceedingly close issue on the facts presented to the jury, and it was of the utmost importance that the trial court confine the argument of counsel to the facts established by the testimony actually produced, rather than permit him to draw conclusions or inferences unfavorable to parties litigant by the absence of testimony which the parties were not called upon by the necessities or emergencies of the case to produce. Contestees could not have called Mr. Rodgers as a witness without violating that delicate sense of propriety which, happily, usually restrains counsel on opposing sides from engaging in a "swearing match" to uphold their respective contentions. That clients and their counsel show a proper appreciation of the professional ethics which generally causes reputable members of the legal profession to refrain from playing the double role of lawyer and witness will always be encouraged rather than condemned when brought to the attention of this court.

The lawyer, however, is a competent witness in the case where he is also paid counsel; and where he is placed in the unfortunate position of seeing an absolute miscarriage of justice

unless he testifies, a sense of duty to his client might constrain. him to become a witness, and in such case he could do so without. the least impropriety. Instances of the kind rarely occur. Certainly they never occur where the facts which the attorney may be expected to disclose are known and can be proved by other .witnesses. Such was the case at bar. Mr. Rodgers, so far as the record shows, knew no fact that could not have been, and was not, established by other witnesses. There was no question of the want of mental capacity of the testatrix to comprehend the document which he had written and which she signed in his presence as a witness. The only possible effect of his testimony, so far as we can see, would have been to corroborate or contradict the testimony of some other witness in the cause, possibly on some collateral matter.

Appellant's cause must not be prejudiced because they and their counsel observed the rule of professional ethics which almost universally obtains among laywers of good repute. Indeed, in the case at bar appellants and their counsel could hardly have violated the rule without subjecting themselves and their cause to just criticism, calculated to prejudice their interest before the jury.

In *Frear* v. *Drinker,* 8 Pa. St. 520, it is said: "It is a. highly indecent practice for an attorney to cross-examine witnesses, address the jury and give evidence himself to contradict the witness. It is a practice which, as far as possible, should be discountenanced by courts and counsel. * * It is sometimes. indispensable that an attorney, to prevent injustice, should give evidence for his client. * * * All the courts can do is to discountenance the practice, and, where the evidence is indispensable, to recommend to the counsel to withdraw from the cause." Mr. Greenleaf says: "In regard to attorneys, it has in England been held a very objectionable proceeding on the part of an attorney to give evidence when acting as advocate in the cause, and a sufficient ground for a new trial." 1 Greenleaf, Ev. § 254, and cases cited. Of course, such is not the rule in this country. In *Ross* v. *Demoss,* 45 Ill. 447, this language is used: "It is of doubtful professional propriety for an attorney to become a witness for his client without first entirely withdrawing from any further connection with the case; and an

attorney occupying the attitude of both witness and attorney for his client subjects his testimony to criticism, if not suspicion.   *
While the profession is an honorable one, its members should not forget that even they may so act as to lose public confidence and general respect." *Little Rock & Ft. S. Ry. Co.* v. *Cavenesse,* 48 Ark. 131; Weeks on Attorneys at Law, § 124; Rapalje, Witnesses, § 43; *Walsh* v. *Murphy,* 2 Green's Rep. 227; See 3 Wig. Ev. § 1911 and notes for an interesting discussion on the subject; *Brown* v. *Swineford,* 44 Wis. 282; *Spencer* v. *Kinnard,* 12 Tex. 180, 188; *Little* v. *McKean,* 1 Sand. N. Y. 607, 609.

Mr. Rodgers was the attorney for the proponents of the will before the probate court, and we assume, from the record, that he was at least one of the leading counsel in the trial of the cause before the circuit court. Having drawn the will and being present when it was signed, and having witnessed the same, he was cognizant of what took place at the time. Commenting upon his failure to testify *"as a circumstance to be considered against the contestees"* was tantamount to saying to the jury that it was the duty of appellants to have produced him, and the fact that they did not do so left the inference that what he knew was against them. The jury by this sort of argument were left to imagine what it was that Mr. Rodgers knew that by his failure to tell should be used as a circumstance against appellants. They were left to speculate as to what Mr. Rogers knew, and then to say that, whatever it was, because he did not tell it, the jury were warranted in concluding that it was unfavorable to the contestees.

The court, by failing to stop counsel, to reprimand him for the argument, and to take it from the jury when objection was made, virtually held that the remarks were proper. *St. Louis, I. M. & S. Ry. Co.* v. *Harrison,* 76 Ark. 430, 434.

The error is so pronounced and so calculated to give appellees an unfair advantage that a majority deem it unnecessary to go into a consideration of the numerous other assignments of error. Reversed and remanded for new trial.